711 So.2d 952 (1998)
Ex parte STATE of Alabama ex rel. Fob JAMES, Governor, and Jeff Sessions,[*] Attorney General.
(In re STATE of Alabama ex rel. Fob JAMES, Governor, and Jeff Sessions, Attorney General v. ACLU OF ALABAMA, et al.).
Roy S. MOORE
v.
AMERICAN CIVIL LIBERTIES UNION OF ALABAMA, et al.
STATE of Alabama ex rel. Fob JAMES, Governor, and Bill Pryor, Attorney General
v.
ACLU OF ALABAMA and Alabama Freethought Association.
1951975, 1960572, 1960839 and 1960927.
Supreme Court of Alabama.
January 23, 1998.
On Application for Rehearing April 10, 1998.
*954 Bill Pryor, atty. gen., and John J. Park, deputy atty. gen.; and William P. Gray, Jr., Governor's legal advisor, for the State of Alabama and Chief Justice Perry O. Hooper, Sr.
D. Stephen Melchior, Cheyenne, Wyoming; and Myron K. Allenstein of Allenstein & Associates, Gadsden, for Judge Roy S. Moore.
Robert D. Segall of Copeland, Franco, Screws & Gill, P.A., Montgomery; James Tucker, Montgomery; and Pamela L. Sumners, Birmingham, for American Civil Liberties Union of Alabama, Gloria Hersheiser, Herb Stappenbeck, and Barbara Stappenbeck.
Joel L. Sogol, Tuscaloosa, for Alabama Freethought Association.
Tammy W. Parris, Gadsden, for amicus curiae The Christian Family Ass'n.
James Matthew Henderson, Sr., and Colby M. May of American Center for Law and Justice, Washington, D.C.; Jay Alan Sekulow and John G. Stepanovich of American Center of Law and Justice, Virginia Beach, Virginia; and Ike Gulas, Birmingham, for amicus curiae Members of the Alabama Delegation to the One-Hundred Fifth Congress of the United States.
A. Eric Johnston of Johnston, Trippe & Brown, Birmingham, for amicus curiae Rutherford Institute of Alabama, Inc.
Stuart J. Roth, Mobile, for amicus curiae American Center for Law and Justice of Alabama.
Barry E. Teague, Montgomery, for amici curiae American Family Ass'n of Alabama and National Clergy Council.
Marc D. Stern, American Jewish Congress, New York, New York, for amici curiae American Jewish Congress, People for the American Way, and Americans United for Separation of Church and State.
Robert R. Baugh, Julian D. Butler, and Steven A. Brickman, Birmingham; and Ruth Lansner, Steven Freeman, Debbie Kaminer, and Johnathon Barash, New York, New York, for amicus curiae Anti-Defamation League.
Mark N. Chambless, Karen P. Chambless, and Leonard N. Math, Montgomery, for amicus curiae a group "known as Alabama Historians".
Steven K. Green, Washington, D.C., and Jerome A. Cooper, Birmingham. J. Brent Walker and Melissa Rogers were listed "of counsel", for amici curiae Alabama Clergy, Baptist Joint Committee on Public Affairs, Clifton Kirkpatrick as Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.), Interfaith Alliance, and Union of American Hebrew Congregations.
COOK, Justice.
The petitioner or appellant in two of these four cases is the State of Alabama, upon the relation of Governor Fob James and Attorney General Bill Pryor, and the appellant in the other two is Judge Roy Moore of the Etowah Circuit Court. They seek review of a judgment entered in the Montgomery County Circuit Court declaring certain aspects of Judge Moore's courtroom decorum and practice to violate the Establishment Clause of the First Amendment of the United States Constitution. We dismiss these four cases.
The events out of which this litigation arose began in 1993, with a series of correspondence initiated by Joel Sogol, on behalf of the American Civil Liberties Union of Alabama ("ACLUA"). On June 9, 1993, Sogol drafted a letter to Sonny Hornsby, then Alabama Supreme Court Chief Justice, stating in pertinent part:
"This letter comes in an attempt to avoid litigation involving a number of judges in this State. We have received complaints from people in a large number of circuits regarding prayers prior to jury week terms. Generally, these situations will involve a judge inviting a preacher or minister to give the prayer just after the jury has been sworn in.
"I have enclosed for you a copy of North Carolina Civil Liberties Union Legal *955 Foundation v. Constangy, which I believe to be the most current case on point. As you can see, the 9th Circuit held the practice of prayer before court unconstitutional, and we are prepared to go to court if necessary. It is my hope that in your capacity of Chief Justice, you would be willing to put a stop to this practice, and that litigation would then be unnecessary."
On June 25, 1993, Oliver Gilmore, administrative director of courts, responded to the ACLUA by the following letter:
"This is in response to your letter, dated June 9, 1993, to Chief Justice Sonny Hornsby regarding the practice of having prayers in the courtroom at the beginning of jury sessions. We intend to bring this matter to the attention of the Presiding Circuit Judges at their meeting on Wednesday, July 14, 1993, and to provide them with ... copies of your letter to the Chief Justice, as well as the Constangy case."
On July 6, 1994, Sogol sent another letter to Chief Justice Hornsby, stating in pertinent part:
"Approximately one year ago, I wrote you regarding judges having prayers recited in court. In an effort to avoid litigation, I asked you, as the administrative head of the State Judicial System, to stop that practice. In the time that has passed, some judges have complied. Unfortunately, many have not, and in fact, some have gotten worse.
"I again appeal to you in your administrative capacity to halt this unconstitutional conduct on the part of judges. I enclose the Constangy case and the Harvey case for your review. Given the scarce resources of our judicial system, it seems a shame to squander funds in this type litigation. However, if no action is forthcoming from within the system, I will have no choice but to file suit."
Litigation subsequently began, with the filing of a complaint in the United States District Court for the Northern District of Alabama by (1) the Alabama Freethought Association ("AFA"), (2) Gloria Hersheiser, and (3) Herb Stappenbeck and Barbara Stappenbeck, against Judge Roy Moore of the Etowah County Circuit Court. Alabama Freethought Ass'n v. Moore, 893 F.Supp. 1522, 1524-25 (N.D.Ala.1995). The complaint contained the following allegations: (1) that a number of members of the AFA, along with Hersheiser and the Stappenbecks, were residents of Etowah County, and, consequently, were "subject to attending Judge Moore's courtroom in Gadsden, either as jurors, litigants, witnesses or observers," id. at 1525 (emphasis in original); (2) that Judge Moore "has caused a plaque depicting the Ten Commandments to be hung behind the bench in his courtroom" and that "in presiding over jury organizing sessions, [he] has caused prayer to be uttered," id. at 1524; (3) that the pre-session prayer and display of the Ten Commandments violates the Establishment Clause of the First Amendment to the United States Constitution; and (4) that, as a result of these practices, the plaintiffs, should they be called to appear in Judge Moore's courtroom, "would be, offended" and would be required to "assume special burdens to avoid [the allegedly] unconstitutional conduct." Id. at 1525 (emphasis in original). On April 21, 1995, Judge Moore "filed a Motion to Dismiss, or in the Alternative, for Stay," in which he contended, among other things, that the plaintiffs lacked "standing, as either citizens or taxpayers, to maintain this action." Id. at 1524.
The same day, the State of Alabama, upon the relation of Governor Fob James and then Attorney General Jeff Sessions, filed a complaint in the Montgomery County Circuit Court. The case was assigned to Circuit Judge Charles Price. The complaint named as defendants the American Civil Liberties Union of Alabama (the "ACLUA") and Judge Roy Moore. It also named as defendants (1) the AFA, (2) Gloria Hersheiser, and (3) Barbara and Herb Stappenbeck (hereinafter collectively designated the "AFA"). The complaint contained the following factual allegations:
"7. Defendant the Honorable Roy S. Moore (`Moore') has been a judge of the Circuit Court of Etowah County since November 1992. When Judge Moore became a circuit judge, the Circuit Court of Etowah County began its commissioning of jurors with a prayer, including, for example, a call on God to save the Court and an expression of thanks for due process of law.

*956 "8. This practice has occurred for many decades in the Circuit Court of Etowah County.
"9. The Supreme Court of the United States and other courts of the United States open their sessions with a prayer requesting God to save the court, and the Supreme Court has used this practice, or a similar one, for over two centuries.
"10. The opening sessions of deliberative public bodies with prayer is deeply embedded in the history and tradition of this country.
"11. Defendant Moore has continued the practice of opening sessions of the Etowah County Circuit Court with prayers since becoming a circuit judge.
"12. In addition, Defendant Moore has placed on the wall of the courtroom where he presides, a plaque of the Ten Commandments, which Judge Moore hand-carved. Judge Moore also has displayed in his courtroom artistic renderings of other important documents related to American history: the Declaration of Independence and the Mayflower Compact. Moore also has displayed large pictures of George Washington and Abraham Lincoln. All of the items have been displayed by Moore for most of the period of time Moore has been a circuit judge.
"13. The chamber of the Supreme Court of the United States contains a depiction of Moses with the Ten Commandments.
"14. Defendant Moore has announced that he believes it impossible to sit in judgment of others without the guidance of God, and Judge Moore believes that the display of the Ten Commandments and the use of prayer to open Court is a logical necessity and a reasonable acknowledgment of the presuppositions upon which the American government and civilized society are based.
"15. Defendant Moore does not engage in proselytizing during the course of performing his duties as a circuit judge for the State of Alabama.
"16. Judge Moore's acknowledgments of God serve legitimate secular purposes of solemnizing court proceedings, expressing confidence in the future, and encouraging recognition of what is worthy of appreciation in society.

"17. These acknowledgments are not understood as conveying government approval of particular religious beliefs, and cannot be fairly understood as conveying such government approval of particular religions so as to amount to an `establishment' of religion.

"18. In June 1994, the ACLU of Alabama demanded that the State Judicial Department halt any circuit judge from allowing jury sessions to begin with prayer and further threatened litigation if the practice continued.
"19. The policy of the State of Alabama is to allow judges to preside over their courtrooms in the manner they see fit for conducting proceedings involving the rights of citizens of Alabama and of the United States. There is no State policy either requiring or prohibiting the opening of court proceedings with a prayer nor is there a state policy either requiring or prohibiting the depiction of the Ten Commandments on the walls of a courtroom.
"20. The State of Alabama, through its Judicial Department, has supervisory authority over its circuit judges and the manner in which they conduct proceedings. Judges are constitutional officers of the State of Alabama paid a base salary by the Comptroller of the State of Alabama.
"21. There are or may be other circuit judges in the Judicial Department that engage in some or all of the practices described above.
"22. The Constitution of Alabama reflects an acknowledgment of God's role in the foundation of the government and the rights of citizens. The [Constitution] of Alabama declares that the rights of its citizens come from a Creator and does so by tracking substantially the language of the Declaration of Independence. The constitution of Alabama provides in article I, section 1, that `all men are created equally free and independent; they are endowed by their Creator with certain inalienable rights, that among these are life, liberty, and the pursuit of happiness.'
"23. The Preamble to the Constitution of Alabama recites that this state government was established by the people of *957 Alabama seeking `the favor and guidance of Almighty God' for the purpose of `establish[ing] justice, insur[ing] domestic tranquility, and secur[ing] the blessings of liberty.'
"24. The constitution of Alabama provides for the protection of religious freedom and prohibits the establishment of religion by law. Article I, section 3, provides as follows:
"`That no religion shall be established by law; that no preference shall be given by law to any religious sect, society, denomination, or mode of worship; that no one shall be compelled by law to attend any place of worship; nor to pay any tithes, taxes, or other rate for building or repairing any place of worship, or for maintaining any minister or ministry; that no religious test shall be required as a qualification to any office or public trust under this state; and the civil rights, privileges, and capacities of any citizen shall not be in any manner affected by his religious principles.'
"25. Plaintiff seeks to determine, in part, that Defendant Moore's actions do not violate these provisions of the Constitution of Alabama.
"26. Defendants Alabama Freethought Association, Hersheiser, and Stappenbeck have asserted that they are offended by the prayers occurring in Defendant Moore's courtroom and the display of the carving of the Ten Commandments. They have filed a lawsuit in federal court against Defendant Moore alleging that such practices violate the establishment ... clause of the First Amendment to the U.S. Constitution, and article I, section 3, of the Alabama Constitution. These defendants have not been litigants or jurors in proceedings over which Defendant Moore has presided.
"27. Plaintiff contends that, under the Eleventh Amendment of the U.S. Constitution, the federal court in which Defendants Alabama Freethought Association, Hersheiser, and Stappenbeck have brought their action does not have jurisdiction to decide the claims made under the Alabama Constitution. The plaintiff and Judge Moore also contend that the federal court must, under federal law, abstain from hearing this controversy while this matter is before the courts of this State. The plaintiff is interested in the quickest possible resolution of this issue in a court that is competent to decide all of the issues raised by these defendants."
(Emphasis added.)
The State's "demand for judgment" was expressed as follows:
"WHEREFORE, the State of Alabama requests a judgment
"A. declaring that the State of Alabama's policy allowing judges to preside over their courtrooms as they see fit and declining to prohibit Defendant Moore and other circuit judges from engaging in the conduct described herein, despite knowledge thereof, is not violative of the Establishment Clause of the First and Fourteenth Amendments to the U.S. Constitution or article I, section 3, of the Alabama Constitution.
"B. declaring that the Defendant Moore's display of a carving of the Ten Commandments on the wall of his courtroom is not in violation of the Alabama Constitution, article I, section 3;
"C. declaring that the Defendant Moore's display of a carving of the Ten Commandments on the wall behind his bench in his courtroom is not in violation of the First and Fourteenth Amendments to the United States Constitution;
"D. declaring that the Defendant Moore's continuation of the long-standing practice of holding prayer by a minister or lay person to open proceedings of his court is not in violation of the Alabama Constitution, article I, section 3; and
"E. declaring that the Defendant Moore's continuation of the long-standing practice of holding prayer by a minister or lay person to open proceedings of his court is not in violation of the First and Fourteenth Amendments to the United States Constitution."
(Emphasis added.) The complaint sought no relief from actions of the AFA or the ACLUA.
Judge Moore answered the State's complaint and admitted the substantive allegations *958 in every paragraph of the complaint seriatim, with one exception. That exception was ¶ 20, in which the relators alleged that circuit judges were subject to the direction and control of the State, acting through the "Judicial Department." He counterclaimed against the State on the basis of that disagreement. In his counterclaim he sought a "judgment declaring that the State of Alabama does not have authority to prohibit Defendant Moore, or any other circuit judge, from displaying the Ten Commandments in his courtroom or from having a prayer at the beginning of court." In all other respects, however, Judge Moore "join[ed] with the State of Alabama in requesting a judgment" declaring that the challenged practices were constitutional. (Emphasis added.)
On May 22, 1995, the AFA and the ACLUA filed a "notice of removal" of the action to the United States District Court for the Middle District of Alabama. The State contested removal. Judge Moore, the only other defendant, not only refused to join in the removal request, but, like the State, objected to removal. He filed a "motion to remand" the cause to the state court. Because of the position taken by Judge Moore, the district court remanded the cause.
Meanwhile, on July 7, 1995, the United States District Court, in which this litigation was commenced, dismissed the action, without prejudice. Alabama Freethought Ass'n v. Moore, 893 F.Supp. 1522, 1545 (N.D.Ala. 1995). That court issued a written opinion in which it agreed with the assertion of Judge Moore in his "Motion to Dismiss, or in the Alternative, for Stay," namely, that the AFA, Hersheiser, and the Stappenbecks, plaintiffs in the district court, lacked "standing, as either citizens or taxpayers, to maintain [the] action." Id. at 1524, 1544-45. That judgment was not appealed.
On December 8, 1995, Judge Moore cross-claimed against the ACLUA, seeking, among other things, to enjoin it from participating in litigation to challenge his courtroom practices. On January 8, 1996, the ACLUA and the AFA filed an answer to Judge Moore's crossclaim.[1]
On May 13, 1996, the ACLUA and the AFA filed counterclaims against the State of Alabama, seeking declaratory and injunctive relief. More specifically, they sought to enjoin the State of Alabama (1) from permitting "circuit judges, including Judge Roy Moore,... to open public court proceedings with prayer in the presence of ... jurors" and (2) from "permit[ting] the depiction of the Ten Commandments on the walls of public courtrooms as an acknowledgment of G-d, ... without regard to whether ... the depiction... is displayed ... in any context other than a religious one."
On May 21, 1996, the State moved to dismiss all the counterclaims. The relators contended that "they had filed suit not as officials of the state, but rather on relation of the state. Accordingly, they contended, the counterclaims actually had been filed against the state itself and were barred by sovereign immunity." Response of ACLU of Alabama and Related Defendants to Petition for Writ of Mandamus, at 5 (emphasis added).
In response to these contentions, the AFA amended its counterclaim to add as a counterclaim defendant Perry O. Hooper, Sr., in his official capacity as Chief Justice of the Alabama Supreme Court. On July 1, 1996, the trial court dismissed the "counterclaims of the defendants ... insofar as they state a cause of action against the State of Alabama." On July 9, 1996, the ACLUA made a claim against Chief Justice Hooper by expressly joining the amended counterclaim of the AFA. Judge Moore did not amend his counterclaim, and, consequently, does not have a claim against Chief Justice Hooper.
On July 17, 1996, Chief Justice Hooper moved the trial court to dismiss the counterclaims against him, contending:
"1. The counterclaim[s] fail[] to state a claim against [him].
"2. As a matter of law, Chief Justice Hooper, by himself, has no authority to control the conduct of a circuit judge.
"3. Chief Justice Hooper, standing alone, has no legal authority to control what items are displayed on the walls of a trial courtroom. Specifically, Chief Justice Hooper has no legal authority to control *959 the decoration of Judge Moore's (or Judge Price's or any circuit judge's) courtroom.
"4. Chief Justice Hooper, standing alone, has no legal authority to control the speech or prayers of any person in any trial courtroom in the State of Alabama. Chief Justice Hooper has no legal authority to prohibit any person or group of persons from praying in a trial courtroom."
(Emphasis added.) The trial court denied that motion.
On August 29, 1996, the State and Chief Justice Hooper petitioned this Court for a writ of mandamus directing the trial court to "vacate [its] orders allowing the counterclaim[s] against Chief Justice Hooper and [to] dismiss [those] counterclaim[s]." That petition is now before this Court (case 1951975).
On November 22, 1996, the trial court entered an order stating in pertinent part:
"This case is submitted for final determination by the court on the pleadings, the evidence, and on the briefs and oral arguments of the parties.
"....
"1. It is hereby DECLARED that the practice or policy of permitting Alabama's circuit judges, and/or of circuit judges' undertaking on their own to conduct or arrange for prayer, including the prayer of a particular faith, in public courts and in the presence of individuals who have been summoned by legal process for jury duty, violates the First and Fourteenth Amendments to the United States Constitution and Article I, § 3, of the Constitution of Alabama.
"2. It is hereby DECLARED that the display of the Ten Commandments in the courtroom intermingled with the historical and/or educational items does not violate the First and Fourteenth Amendments of the United States Constitution and Article I, § 3, of the Constitution of Alabama."
(Emphasis added.) The trial court enjoined Judge Moore "from arranging for or otherwise permitting prayer in court and in the presence of individuals who have been summoned by legal process for jury duty." It further ordered the "counter[claim]-defendants in their official capacit[ies] ... to take all reasonable steps to prevent the conduct of unconstitutional prayer in the public courts... and to take all reasonable steps to have... any and all ... judges of the State of Alabama to immediately cease and desist from acting in this unlawful manner." (Emphasis in original.)
On December 3, 1996, the ACLU and the AFA moved for "reconsideration" of the Ten Commandments issue. On December 30, 1996, Judge Moore appealed the November 22 judgment. The appeal of that judgment is designated as case 1960572.
On February 10, 1997, the trial court reconsidered its holding on the display and entered an order stating in part: "Based on the fact that the plaques are hanging in the courtroom on the wall alone for the obvious and stated purpose of promoting religion, the court finds that their presence as displayed, is a violation of the Establishment Clause of the United States Constitution and the Constitution of Alabama." The trial court ordered Judge Moore to choose whether (1) to integrate the plaques within "a larger display of nonreligious and/or historical items," or (2) to remove the plaques.
On February 19, 1997, Judge Moore also appealed from that judgment. Judge Moore's second appeal is designated as case 1960839. On March 5, 1997, the State appealed from both judgments, namely, the one entered on November 22, 1996, and the one entered on February 10, 1997. The State's appeal is designated as case 1960927.
Following these notices of appeal, an impressive number of amici curiae filed briefs in this Court. While the appeals were pending, we received a considerable amount of correspondence from private persons expressing support for one side or the other. From its inception, this litigation has attracted the attention of the national news media, as well as that of the local media.
It is clear, therefore, that this litigation has ignited a public controversy. It does not follow, however, that the controversy is one that is justiciable. Indeed, whether it involves a bona fide, justiciable controversy is a matter into which we must inquire, ex *960 mero motu in this instance, as a threshold issue.[2] Resolution of this inquiry will necessitate separate discussions of the justiciability of the claims of (1) the original plaintiff, the State of Alabama, and (2) the counterclaim plaintiffs, the ACLUA and the AFA.

I. The Claims of the Plaintiff
Not all controversies, even very public ones, are justiciable. Justiciability is a compound concept, composed of a number of distinct elements. Chief among these elements is the requirement that a plaintiff have "standing to invoke the power of the court in his behalf." Ex parte Izundu, 568 So.2d 771, 772 (Ala.1990). Unless a plaintiff's interest in acquiring a favorable judgment is one that is "tangible," Reid v. City of Birmingham, 274 Ala. 629, 639, 150 So.2d 735, 744 (1963), and "concrete," Brown Mechanical Contractors, Inc. v. Centennial Ins. Co., 431 So.2d 932, 937 (Ala.1983), he has no standing to assert his claims. Moreover, as we explained in Reid:
"`Not only must the plaintiff prove his tangible interest in obtaining a judgment, but the action must be adversary in character, that is, there must be a controversy between the plaintiff and a defendant, subject to the court's jurisdiction, having an interest in opposing his claim. Unless the parties have such conflicting interests, the case is likely to be characterized as one for an advisory opinion, and the controversy as academic, a mere difference of opinion or disagreement not involving their legal relations, and hence not justiciable.'"
274 Ala. at 639, 150 So.2d at 744 (quoting E. Borchard, Declaratory Judgments, 29-30) (emphasis added). Thus, "`[t]he absence of adversary or the correct adversary parties is in principle fatal.'" Rogers v. Alabama Bd. of Educ., 392 So.2d 235, 237 (Ala.Civ.App. 1980) (quoting E. Borchard, Declaratory Judgments 76 (2d ed.1941)) (emphasis added). See also Stamps, 642 So.2d at 944.
These principles were thoroughly discussed and applied in State ex rel. Baxley v. Johnson, 293 Ala. 69, 300 So.2d 106 (1974). That case involved an action commenced by the State upon the relation of the attorney general, "against the Superintendent of Banks of the State of Alabama." 293 Ala. at 71, 300 So.2d at 106. The State purported to seek a judgment declaring that "certain lending institutions," which were subject to provisions of the Mini-Code, currently codified at Ala.Code 1975, §§ 5-19-1 to -32, were imposing finance charges in excess of then existing interest and usury provisions. 293 Ala. at 71, 300 So.2d at 108. The State alleged that the superintendent had "failed to order [the] institutions to cease and desist making finance charges at rates above" the amounts prescribed by statute. Id.
Present at the trial of the "cause" were the parties and representatives of a group of lending institutions that were appearing only as amici curiae. The assistant attorney general representing the State stated: "[W]e feel that there is a great deal of confusion in the State of Alabama as to the interest rates and finance charges allowable ... and as to the various items that go into the finance charge.'" Id. (Emphasis added.) Counsel for the superintendent of banks asserted that the superintendent "ha[d] no position in the case except, of course, to defend the lawsuit itself." 293 Ala. at 71-72, 300 So.2d at 108 (emphasis added).
No pertinent facts were in dispute. The State and the superintendent stipulated "that certain ... institutions who regularly extend[ed] credit and [made] finance charges... [were] charging rates in excess of that allowed by Title 9, Section[s] 60 and 61, Code of Alabama 1940, Recompiled [current version at Ala.Code 1975, §§ 8-8-1 and -2]." 293 *961 Ala. at 72, 300 So.2d at 109. "The trial court found against the contentions of the Attorney General and in conformity with the position taken by amici curiae," and the State appealed. Id.
This Court dismissed the appeal, stating: "We are convinced that this lawsuit is a sham, contrived to secure an advisory opinion on the Mini-Code and that it presented no justiciable controversy between the parties." 293 Ala. at 72, 300 So.2d at 109 (emphasis added). The dispositive facts leading to that conclusion were (1) that the State chose to sue only the superintendent, another state official, not one of the entities said to be violating the statutory scheme, and (2) that the superintendent, who took no adversarial position, had a complete defense to any judgment that could have been entered in the case. That was so, because the Mini-Code expressly exempted those lending institutions appearing as amici from licensing, thus effectively placing them beyond the superintendent's control. 293 Ala. at 72-73, 300 So.2d at 109.
The Court explained:
"The record before us depicts a case, a trial, and an appeal between a plaintiff and defendant who had no real differences between themselves, but the trial and the appeal were for the accommodation of the institutions which appeared as amici curiae in the trial court and later filed a brief in this court.
"....
"`The declaratory judgment statutes do not empower courts to decide moot questions, abstract propositions or to give advisory opinions, however convenient it might be to have the questions decided for the government of future cases.' ...
"... [W]hen the only defendant in the case took no position and the statute under consideration stated that the defendant was without power to apply the Act to the institutions involved in the case, there was no longer a justiciable controversy and one has not existed in the instant case since. Under those circumstances, the decree of the trial court was void....
"....
"Since there was no justiciable controversy and only a `straw man' defendant, the decree of the trial court was void [and] would not support an appeal and the appeal must be dismissed."
293 Ala. at 73-74, 300 So.2d at 109-10 (emphasis added). The Court acknowledged that "the Attorney General has the right and power to file suits for declaratory judgment," but, nevertheless, pointed out that "the parties must be damaged and seeking a remedy, not just advice." 293 Ala. at 74-75, 300 So.2d at 111. (Emphasis added.)
The observations of Justice Jones in a special concurring opinion were even more pointed. He stated: "The Office of the Attorney General allowed itself, wittingly or unwittingly, to be `used` and in turn sought to 'use' this Court in order to get an advisory ruling .... The narrow scope of review invoked by the issues ... is indicative of the `sweetheart' nature of the proceedings." 293 Ala. at 75, 300 So.2d at 111 (emphasis added).
Reduced to its essence, therefore, the holding in Johnson was that the controversy was nonjusticiable because the plaintiff (the State), acting upon the relation of the attorney general, had sued a "straw man defendant," that is, one whose position was not adverse to that of the plaintiff and one against whom the judgment would be ineffective in any event. Also more or less implicit in the Court's rationale was the conclusion that the State had no standing to commence the action, because it had suffered no injury and, consequently, was not "seeking a remedy."
The controversy in Johnson is closely analogous to the one in this case, and the rationale in that case is particularly pertinent in this one. Indeed, as to the claim of the plaintiff State against the defendant Judge Moore, there is not even facial adverseness. On the contrary, the pleadings show, on the face, that the plaintiff and Judge Moore actually support one another. More specifically, the State does not seek a declaration that Judge Moore's actions are incorrect in any respect. On the contrary, the complaint particularly, in those emphasized portions quoted aboveextols the actions of Judge Moore and seeks a judgment declaring that *962 his practices are eminently correct and must be sanctioned. The State does not allege that it has been harmed in any manner by Judge Moore's practices. It does not seek to interfere with this defendant's practices, but, in fact, seeks to perpetuate this defendant's conduct.
Predictably, Judge Moore, in his answer, admitted all the substantive allegations in the complaint.[3] As we stated above, Judge Moore "join[ed] with the State of Alabama in requesting a judgment" declaring that the challenged practices were constitutional. (Emphasis added.) In other words, this defendant expressly agrees with the plaintiff that his practices are constitutional and that he is entitled to continue them in perpetuity.
The absence of adverseness has been evident throughout this litigation. It was evidenced, for example, by the fact that Judge Moore was the only defendant who opposed removal of the action to the federal court. Indeed, the AFA and the ACLUA, at various times throughout the litigation in the trial court, contended that Judge Moore should be realigned as a plaintiff.
Judge Moore thus goes further than the defendant superintendent of banks in Johnson, who took no position on the merits. Judge Moore takes a position on the merits, but he takes a position that is identical to that of the State, and he argues it strenuously. As between the State and Judge Moore, there exists no controversy, whatevernot even a contrived one. This is not what lawsuits are about.
Moreover, "[d]eclaratory judgment actions cannot be invoked merely to try disputes involved in another action, for such contentions may legally be made an issue in the pending action." 2 W. Anderson, Actions for Declaratory Judgments § 401, at 972 (2d ed.1951). When the State filed its complaint, any controversy that did exist had been presented in a case then pending in the United States District Court.
We are convinced, therefore, as was Justice Jones in Johnson, that "[t]he Office of the Attorney General [has] allowed itself, wittingly or unwittingly, to be `used` and in turn [has] sought to 'use' this Court in order to get an advisory ruling." 293 Ala. at 75, 300 So.2d at 111. We will not, however, allow the judiciary of this state to become a political foil, or a sounding board for topics of contemporary interest. We hold, therefore, that the claims of the plaintiff, the State of Alabama, are not justiciable. As we shall now demonstrate, the claims of the counterclaim plaintiffs, the AFA and the ACLUA, stand on no better ground.

II. The Claims of the Counterclaim Plaintiffs
As discussed previously in this opinion, the ACLUA, the AFA, and Judge Moore counterclaimed against the State. The ACLUA and the AFA sought to enjoin the State of Alabama, acting "by and through" its governor and attorney general, (1) from permitting "circuit judges ... to open public court proceedings with prayer in the presence of ... jurors," and (2) from "permit[ting] the depiction of the Ten Commandments on the walls of public courtrooms as an acknowledgment of G-d, ... without regard to whether ... the depiction ... is... in any context other than a religious one." (Emphasis added.)
Judge Moore sought a "judgment declaring that the State of Alabama does not have authority to prohibit ... any ... circuit judge, from displaying the Ten Commandments in his courtroom or from having a prayer at the beginning of court." He specifically challenged the assertions in ¶ 20 of the State's complaint that "[t]he State of Alabama, through its Judicial Department, has supervisory authority over its circuit judges and the manner in which they conduct proceedings."
The trial court dismissed the counterclaims "insofar as they state a cause of action against the State of Alabama." None of the counterclaimants sought review of that dismissal. Instead, the AFA and the ACLUA amended their counterclaims to include a claim against Chief Justice Hooper in his official capacity as "administrator." Judge Moore did not amend his counterclaim to *963 state a claim against Chief Justice Hooper. Therefore, the only remaining counterclaims are those of the AFA and the ACLUA against Chief Justice Hooper.
Those counterclaims seek the relief that the ACLUA had originally sought in its letters dated June 9, 1993, and July 6, 1994, to former Chief Justice Sonny Hornsby, namely, action by the "State Judicial System" to cause the cessation of pre-jury session prayer by all of Alabama's circuit judges. They also seek an injunction against displaying "religious symbols, without regard to the context of the display, on the walls of public courtrooms." (Emphasis added.)
There is a flaw, however, in the manner in which this relief has been sought. That flaw, and it is a fatal one, consists of the fact that the complainants have sued the Chief Justice of the Supreme Court of Alabama, who is unable to provide the relief they seek.
This fact was the only basis of Chief Justice Hooper's defense to the counterclaims. In his motion to dismiss, which he filed on July 17, 1996, Chief Justice Hooper argued that, "as a matter of law," he, acting unilaterally, "has no authority to control the conduct of a circuit judge." This contention was repeated by the attorney general during a hearing on the dismissal motion conducted on August 13, 1996. He argued:
"[Attorney general]: My motion only relates to whether or not they have stated a valid claim against Chief Justice Hooper.
"And my argument is simply this, Your Honor; if you believe that Chief Justice Hooper has the lawful authority under Alabama law to tell you what you canhow you can decorate this courtroom and how you can deal with your jurorsChief Justice Hooper acting by himself, not with any other members of the Supreme Court, just the Chief Justiceif he has that lawful authorityif he can tell you, Judge Price, that you need to remove the American flag from this courtroom or you need to treat jurors a certain way, then I say deny my motion.
"....
"... And there is no single officeholder like the Chief Justice who can micromanage how the circuit judges run their courtroom."
(Emphasis added.) We agree with the contentions of the Chief Justice and the attorney general, namely, that the Chief Justice, acting unilaterally, cannot provide the relief sought by the counterclaim plaintiffs.
The powers and duties of the Chief Justice are described in various provisions of the Constitution and the Code of Alabama. The primary source of his authority is Ala. Const. 1901, amend. 328, § 6.10, which provides in pertinent part: "The chief justice of the supreme court shall be the administrative head of the judicial system. He shall appoint an administrative director of courts and other needed personnel to assist him with his administrative tasks." (Emphasis added.) Pursuant to his administrative authority, he may "take affirmative and appropriate action to correct or alleviate any condition or situation adversely affecting the administration of justice within the state," Ala.Code 1975, § 12-2-30(b)(7), and he may "take any such other, further or additional action as may be necessary for the orderly administration of justice within the state, whether or not enumerated in this section or elsewhere," § 12-2-30(b)(8).
These and other provisions make it clear, however, that the Chief Justice's authority is administrative. A common definition of "administration" is "a furnishing or tendering according to a prescribed rite or formula." Webster's Third New International Dictionary of the English Language 28 (Unabridged) (1986) (emphasis added). The source of his specific authority is the Court, itself, as expressed elsewhere in the Constitution and the Code of Alabama.
Authority to issue such "orders as may be necessary [for] general supervision and control of courts of inferior jurisdiction," is vested by Amendment 328, § 6.02, in the Supreme Court. Similarly, it is the Supreme Court that is charged by Amendment 328, § 6.08, with "adopt[ing] rules of conduct and canons of ethics ... for the judges of all courts of this State." Again, it is the Supreme Court that is charged by Amendment 328, § 6.11, with the duty to "make and promulgate rules governing the administration *964 of all courts and rules governing practice and procedure in all courts."
The significance of the term "supreme court" in §§ 6.02, 6.08, and 6.11 is illustrated by Ala. R.App. P. 16(b), which provides:
"The concurrence of five justices in the determination of any cause shall be necessary..., except when, by reason of disqualification the number of justices ... is reduced, in which event the concurrence of a majority of the justices sitting shall suffice; but, in no event, may a cause be determined unless at least four justices sitting shall concur therein."
(Emphasis added.) Indeed, as a "hornbook" principle of practice and procedure, no appellate pronouncement becomes binding on inferior courts unless it has the concurrence of a majority of the Judges or Justices qualified to decide the cause. Simply stated, action by the Chief Justice is not synonymous with action by the "Court."
The trial court, on November 22, 1996, ordered "[t]he counter[claim]-defendants[, including Chief Justice Hooper] in their official capacit[ies], their agents, servants, employees, and all those acting in concert with them, ... to take all reasonable steps to prevent the conduct of unconstitutional prayer in the public courts of this state." That judgment could be binding only on Chief Justice Hooper, who is a party to the litigation in his official capacity.
Actions will be deemed "not justiciable... `where, by reason of inadequacy of parties defendant, the judgment could not be sufficiently conclusive. `"Stamps v. Jefferson County Bd. of Educ., 642 So.2d 941, 944 (Ala.1994) (emphasis added in Stamps) (quoting E. Borchard, Declaratory Judgments 31 (1934)).[4] In other words, actions will be deemed nonjusticiable "[w]hen the defendant has no power to affect the plaintiff's rights." E. Borchard, supra, at 36. That is the situation in this case.
In summary, despite the public attention it has attracted, the lawsuit out of which these appellate proceedings have arisen does not involve a justiciable controversy. It was "invoked merely to try disputes involved in another action." See 2 W. Anderson, Actions for Declaratory Judgments § 401, at 972 (2d ed.1951). No appeal was taken from the judgment of dismissal in the federal district court. Adverseness between the State and Judge Moore is manifestly nonexistent, and the counterclaim defendants have no power to provide the relief sought by the AFA and the ACLUA.[5] The record does not reveal a cross-claim against Judge Moore in either his individual capacity or in his official capacity.
Because the controversy was nonjusticiable, the trial court lacked subject matter jurisdiction to enter its judgments; those judgments were, therefore, void. "[A] void judgment will not support an appeal ...." Underwood v. State, 439 So.2d 125, 128 (Ala. 1983); see also State ex rel. Baxley v. Johnson, 293 Ala. 69, 300 So.2d 106 (1974). Consequently, the judgments are vacated and these appellate proceedings are dismissed.
1951975JUDGMENT VACATED AND PETITION DISMISSED.
1960572JUDGMENT VACATED AND APPEAL DISMISSED.
1960839JUDGMENT VACATED AND APPEAL DISMISSED.
1960927JUDGMENT VACATED AND APPEAL DISMISSED.
ALMON and SHORES, JJ., concur.
*965 MADDOX and HOUSTON, JJ., concur in the result.
HOOPER, C.J., and KENNEDY, BUTTS,[6] and SEE,[7] JJ., recuse themselves.
MADDOX, Justice (concurring in the result).
This case involves a dispute over whether a State circuit judge can display a small hand-carved plaque of the Ten Commandments in the courtroom where he presides and whether he can invite local clergy members to offer prayer at the first assemblage of prospective jurors without violating the First Amendment to the Constitution of the United States as applied to the States through the Fourteenth Amendment. U.S. Const. amend. I.[8] Another State circuit judge, Judge Charles Price, holding that these practices violated the Establishment Clause of the First Amendment, enjoined the continuation of both practices. This Court stayed the enforcement of the injunction pending our review of that decision.
The majority of the Court, as constituted in this case, sets aside the judgment of the trial court, concluding that the judgment is void because, it concludes, no justiciable controversy exists. I concur in the order setting aside the judgment, but I concur in part and dissent in part as to the rationale of the opinion. I cannot agree that there was no justiciable controversy, but I concur in the result reached because the majority's decision prevents the implementation of the injunction, which is the result that I would reach on the merits. I agree with the majority's conclusion that the Chief Justice does not have the power to control the conduct of a circuit judge.

Scope of This Opinion
I write specially to state why I believe there is a justiciable controversy and why I would overturn the trial court's order on the merits, thereby settling the matter and foreclosing the possibility that a similar action will be filed with the same parties, or different parties, possibly in a different forum.[9] First, I will show why I believe the authority relied on by the majority is inapposite to this case. Second, I will explain why I believe that there is a justiciable controversy involving each of the parties except the Chief Justice, and, therefore, that those parties are entitled to a judgment on the issues submitted to this Court.[10] Finally, I will state what I believe that judgment should be. In making this recommendation, I will apply what I believe to be the law of the land, based on my review of court decisions, law review articles, and biographies of Thomas Jefferson. I have studied each of those materials in an effort to better understand current First Amendment jurisprudence and the so-called "wall of separation" doctrine.[11]

*966 There was a Justiciable Controversy Presented

The majority does not address the First Amendment issues the parties argue in their briefs, but, instead, holds that "the controversy was nonjusticiable," and that "the trial court lacked subject matter jurisdiction to enter its judgments," and that the judgments entered by the trial court "were, therefore, void." 711 So.2d at 964. As I stated earlier, I agree with the result, which is to set the judgments aside, but I cannot agree with the reasoning used by the majority to reach that result.
It is well established under Alabama law that one can seek a declaratory judgment if the facts show that a bona fide justiciable controversy exists between the parties that ought to be settled; a party need not make a case for an injunction. See the Declaratory Judgment Act, Ala.Code 1975, §§ 6-6-220 to -232, and Berman v. Wreck-A-Pair Bldg. Co., 234 Ala. 293, 175 So. 269 (1937). The Declaratory Judgment Act, which substantially adopts a model act that many States have adopted, provides that "[t]his article [i.e., the Act] is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respects to rights, status, and other legal relations and is to be liberally construed and administered." § 6-6-221. More specifically, Alabama law establishes that the Declaratory Judgment Act extends "to cases involving public rights or important public matters and to controversies in which the legality of action of public officials or public agencies is challenged." Morgan v. Board of School Comm'rs of Mobile County, 248 Ala. 22, 25, 26 So.2d 108, 110 (1946).[12]
The majority primarily relies upon State ex rel. Baxley v. Johnson, 293 Ala. 69, 300 So.2d 106 (1974), a case in which I did not participate, and Stamps v. Jefferson County Bd. of Educ., 642 So.2d 941 (Ala.1994), to support its conclusion that this case presents no justiciable controversy. I believe those two cases are factually distinguishable from the present case and are inapposite.
In Johnson, the attorney general filed an action seeking a declaratory judgment against the superintendent of banks, claiming that certain banks were violating applicable regulations and that the superintendent of banks had failed to properly prevent and correct the violations. Johnson, 293 Ala. at *967 71, 300 So.2d at 108. Several banks, rather than participating directly in the litigation as parties, presented their position in the form of amicus briefs. On rehearing, this Court described the superintendent of banks as a "straw-man" defendant, 293 Ala. at 73-74, 300 So.2d at 109-10, because the superintendent, in reality, made no argument in opposition to that of the attorney general. This Court held that the banks appearing as amici curiae were the only entities with a real interest in opposing the attorney general; however, they had not been made parties. Consequently, the Court concluded that the case was nonjusticiable. Johnson, 293 Ala. at 73, 300 So.2d at 110.
In Stamps, 642 So.2d 941, special education teachers brought an action for a declaratory judgment against various officials connected to the Jefferson County Board of Education, claiming that the Board's requirement that they perform certain medical procedures for students made them subject to being prosecuted for violating the Nursing Practices Act, Ala.Code 1975, §§ 34-21-1 to -63. However, the Board of Nursing, the entity responsible for enforcing the Nursing Practices Act, was not made a party to the action. The trial court entered a declaratory judgment in favor of the Board, and the teachers appealed. This Court, noting that the Board of Nursing would not be bound by any decision this Court made in the case, held that the case did not present a justiciable controversy. 642 So.2d at 945. Specifically, the Court explained:
"`Actions or opinions are denominated "advisory,"` and, therefore, not justiciable, 'when there is an insufficient interest in the plaintiff or defendant to justify judicial determination, where the judgment sought would not constitute specific relief to a litigant ... or where, by reason of inadequacy of parties defendant, the judgment could not be sufficiently conclusive.' E. Borchard, Declaratory Judgments 31 (1934) (emphasis added [in Stamps]). `"Actions for declaratory judgments brought by individuals to test or challenge the propriety of public action often fail on this ground, ... because the ... public officer or other person selected as a defendant has ... no special duties in relation to the matters which would be affected by any eventual judgment."` Rogers v. Alabama Bd. of Educ., 392 So.2d 235, 237 (Ala.Civ.App.1980) (emphasis added [in Stamps]) (quoting E. Borchard, Declaratory Judgments 76 (2d ed.1941)). `"The absence of adversary or the correct adversary parties is in principle fatal. A mere difference of opinion or disagreement or argument on a legal question affords inadequate ground for invoking the judicial power."` Id. (emphasis added [in Stamps])."
642 So.2d at 944.
At the outset, I note that it is apparent that this Court's discussion in Stamps, quoted above, is applicable to this case insofar as the Chief Justice is concerned, because the Chief Justice does not have the authority to direct a circuit judge to follow certain guidelines in his management of sessions of court or in decorating the courtroom in which he presides.[13] However, with regard to the remaining parties to this dispute, I believe the facts of the present case stand in stark contrast to those presented in Johnson and Stamps.
As noted by the majority, Joel Sogol, on behalf of the American Civil Liberties Union of Alabama ("ACLUA"), sent a letter to then Chief Justice Sonny Hornsby, stating, "This letter comes in an attempt to avoid litigation involving a number of judges in this State." The letter stated that the ACLUA had received "complaints from people in a large number of circuits regarding prayers prior to jury week terms." The threat of litigation came to fruition when Judge Moore was sued in a federal court by one of the appellees in this present appeal.
*968 Both the ACLUA and the Alabama Free Thought Association ("AFA") were made parties in the trial court in the present case. Both vigorously prosecuted their claims before the trial court and suggested at one point that Judge Moore be realigned as a party plaintiff; realignment of parties is permissible under the Alabama Rules of Civil Procedure and it has been done in other cases involving State officials.[14] A fact that was lacking in Johnson, the presence of a party with an adverse interest, exists in this case.
The result would have been different, of course, had the action continued as it was filed, with the Governor and the attorney general on one side and Judge Moore on the other. If that were the situation before us, I would agree that this case would not present a justiciable controversy. However, that is not the situation in this case. During the course of the proceedings, the ACLUA and the AFA were made parties. The Governor, as the chief magistrate of the State, has a constitutional duty to see that the laws are faithfully executed,[15] and the attorney general, who has been held to have the authority to manage and control all litigation of behalf of the State of Alabama,[16] had a right to seek a declaration of rights on behalf of the State of Alabama.[17]
Upon my review of the record, it seems clear to me that the ACLUA and the AFA actively participated in the trial of this case and that the trial court granted relief that the ACLUA and the AFA considered to be favorable. They have filed briefs in this Court as appellees in support of the trial court's judgment; unlike the banking superintendent in Johnson, who was merely a "straw-man defendant," the ACLUA and the AFA have in the present case occupied roles as adversaries to the State since they were joined as parties.
Based on all of the foregoing facts and circumstances, I conclude that this case presents a classic case of a "justiciable controversy."

The Constitutional Issues Presented
As I understand the briefs, there are two basic issues in this case, both requiring an interpretation of Constitution of the United States:
(1) Does the First Amendment to the United States Constitution permit a State circuit judge to display a hand-carved plaque of the Ten Commandments in a public courtroom that he uses?
(2) Does the First Amendment to the United States Constitution permit a State circuit judge to invite local clergy members to offer prayer at the first assemblage of prospective jurors?
The trial judge held that both practices employed by Circuit Judge Moore were unconstitutional, and he enjoined their continuation. *969 The trial judge's order in this case is based upon Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and two lower federal court cases that applied the Lemon test.[18] Those lower-court cases are North Carolina Civil Liberties Union Legal Foundation v. Constangy, 947 F.2d 1145 (4th Cir.1991), cert. denied, 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992) (where a North Carolina state judge was prohibited from offering prayer in his courtroom), and Harvey v. Cobb County, Ga., 811 F.Supp. 669 (N.D.Ga.1993), aff'd. mem., 15 F.3d 1097 (11th Cir.1994), cert. denied, 511 U.S. 1129, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994) (Ten Commandments display in courthouse shows government endorsement of religion).
I recognize that, in reaching his decision, the trial judge applied what he believed was required by Lemon; nonetheless, I believe the trial judge failed to consider the fact that many legal writers believe the United States Supreme Court, in Rosenberger v. Rector & Visitors of University of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), moved away from the Lemon test, and that Lemon may be dead.[19] Although I do not necessarily agree with all the assessments that have been made, and which will continue to be made, suggesting that Lemon is dead, I do believe that the Supreme Court is shifting away from its strict application. Many writers of law review articles think that Establishment Clause jurisprudence was affected by the Court's decision in Rosenberger, and I think that decision should at least be considered in the resolution of the present case. My own personal assessment of Rosenberger is that the Supreme Court has, in fact, moved away from the Lemon test and has continued its assault on the strict application of the "wall of separation" doctrine that had long been the basis of First Amendment cases.[20]
First Amendment jurisprudence is obviously complex, confusing, and sometimes seemingly inconsistent, but I believe that Rosenberger gives guidance for resolving what many have said is a difficult task.

Summary of the Arguments
I first set out the arguments of the parties and the various persons and organizations that have filed amicus briefs.

The State of Alabama
The State of Alabama, through its Governor and its attorney general, argues that brief invocations at the beginning of court sessions are constitutional and are consistent with Marsh v. Chambers, 463 U.S. 783, 786, *970 103 S.Ct. 3330, 3333, 77 L.Ed.2d 1019 (1983), in which the Supreme Court upheld a state legislature's practice of beginning each session with prayer by a chaplain chosen by the executive board of the Legislative Council and paid out of public funds. The State says that the practices in Etowah County involve far less entanglement of church and state than the practices in Marsh because the clergy members in Etowah County who provide invocations in Judge Moore's courtrooms are not paid out of public funds, whereas the chaplains in Marsh were. The State says that the clergy members who pray in Judge Moore's court are invited on a rotating basis, that they compose their own prayers, that prayers are offered only at the beginning of the weeks when the jury venire is first assembled, and that the prayers are short.[21]
The State further contends that the trial court's reliance on Constangy, 947 F.2d 1145, is erroneous because in Constangy the defendants did not offer substantial evidence of the American tradition of opening court sessions with prayer, and because in Constangy the judge himself composed and offered the prayer.
The State also contends that the display of the Ten Commandments in Judge Moore's courtroom is constitutional, arguing that the trial court, in making its ruling, ignored two cases upholding the display of the Ten Commandments on state property; the State cites Anderson v. Salt Lake City Corp., 475 F.2d 29 (10th Cir.1973), cert. denied, 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973), and State v. Freedom From Religion Foundation, 898 P.2d 1013 (Colo.1995), cert. denied, 516 U.S. 1111, 116 S.Ct. 909, 133 L.Ed.2d 841 (1996). The State contends, also, that given the legal and historic significance of the Ten Commandments, the display of the Ten Commandments has secular purposes, and that the plaque is an appropriate courtroom decoration, especially in light of the fact that the Supreme Court of the United States has three displays of the Ten Commandments in and about its courtroom.

Judge Roy Moore
Judge Moore principally relies on Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019, in support of his practice of inviting members of the clergy to offer a prayer when the jury first assembles. He argues that his practice of opening jury sessions with clergy-led prayer and his practice of displaying a copy of the Ten Commandments on his courtroom wall do not violate the Constitution. As a preliminary matter, Judge Moore argues that those practices amount simply to a public acknowledgement of God, and he suggests that such public acknowledgements of God are common, citing, among other references to God, those appearing in the Pledge of Allegiance and on United States currency. He cites Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), for the proposition that the Supreme Court has recognized that the United States is a Christian nation and for the proposition that the Constitution must be interpreted based on the original intent of the framers, which, he argues, the Supreme Court has held can be understood *971 by looking to the actions of the First Congress. Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). Judge Moore contends that the First Congress would not have viewed the practices at issue in this case as violating the Establishment Clause, but that the Establishment Clause was adopted for the purpose of preventing the newly formed National Government from establishing a national denomination.
Judge Moore, like the State, argues that Marsh controls this case and that the Lemon test should not be applied. He states that, although Lemon is not necessarily dead, it is increasingly ignored by the Supreme Court and by lower federal courts, noting that the Supreme Court has issued decisions involving the Establishment Clause in which the Lemon test was not applied. He argues that Lemon may still be one of four tests that may be used in these cases, but that Lemon has lost much of its importance in the debate over First Amendment freedoms.
Judge Moore argues that, although Marsh concerned prayer at legislative meetings, it applies to judicial prayer as well. He notes that in its decision the Supreme Court specifically mentioned references to God in the cry used to open contemporary federal courts. Therefore, because it is a tradition to open court in Etowah County with prayer, Judge Moore argues that doing so is an acceptable practice under Marsh. Further, he asserts that the Court of Criminal Appeals, in Huff v. State, 596 So.2d 16 (Ala.Crim.App.1991), recognized the Marsh test as controlling on the issue of prayer in the courtroom.
Judge Moore distinguishes Constangy on several grounds: (1) that, in Constangy, Judge Constangy led the prayers himself, whereas Judge Moore has members of the clergy do so; (2) that he presented more evidence than Judge Constangy did to indicate that offering an opening prayer is a long-standing custom; (3) that he has prayers only at the beginning of a jury session, not every day, as Judge Constangy did; and (4) that in his courtroom, it was traditional to invite clergy members from several different denominations in Etowah County to pray.
Judge Moore also argues that the Ten Commandments played a large role in the development of American law, and, therefore, that this Court should apply the Marsh historical-precedent test and conclude that his display of the Ten Commandments is not constitutionally prohibited.
Judge Moore finally argues that the Constitution forbids hostility toward religion. In support of that argument, he reviews Supreme Court decisions that have declined to take a rigid view of the Establishment Clause, e.g., Lynch v. Donnelly, 465 U.S. 668, 678, 104 S.Ct. 1355, 1361-62, 79 L.Ed.2d 604 (1984). He argues that any test that would excise all religious expression from public life is unconstitutional.

The American Civil Liberties Union of Alabama
The ACLUA argues that Judge Moore's practice of opening jury sessions with clergy-led prayer and his practice of displaying the Ten Commandments in his courtroom violate the Lemon test and are therefore unconstitutional. The ACLUA acknowledges that members of the Supreme Court have proposed alternative tests, but it argues that no case has specifically overruled Lemon and that other proposed tests have failed to win a majority; therefore, the ACLUA argues that the Lemon test is still the law.[22]
Regarding the use of members of the clergy to offer prayers, the ACLUA argues that prayer is inherently religious and that any secular purpose Judge Moore ascribes to the prayer could be achieved through practices or means that do not involve prayer. Therefore, it argues, the practice of offering prayers fails to meet the "secular purpose" prong of Lemon.
The ACLUA also argues that, contrary to Judge Moore's contention, this case is indistinguishable from Constangy, a case in which a state court judge's practice of beginning his *972 opening court session with prayer was held to violate the Establishment Clause.
The ACLUA also argues that the main effect of Judge Moore's practice of allowing prayers is to endorse Christianity, arguing that nonbelievers will be coerced into participating. It also contends that the prayers, which have been implicitly endorsed from the bench, constitute excessive entanglement.
The ACLUA argues that Marsh, heavily relied upon by the State and Judge Moore, is inapplicable to this case. It argues that Marsh was limited to legislative prayer, and that Constangy distinguished Marsh and held that opening court with prayer is different from opening a legislative session with prayer, because of the judicial duty to be impartial and because of the coercion the ACLUA says is applied by requiring citizens to perform jury duty. Further, the ACLUA argues that no party presented substantial evidence that there is a long-standing tradition, either in Alabama courts or in federal courts, of opening sessions with a prayer.
Regarding Judge Moore's displaying of the Ten Commandments, the ACLUA states that the practice violates each prong of the Lemon test, because the Ten Commandments are part of a religious text that provides guidance to believers. They argue that placing the Commandments on public display in the courtroom implies endorsement of that religious text by the court, citing Harvey v. Cobb County, 811 F.Supp. 669, in which the trial judge applied the Lemon test, just as the Constangy court had done. The ACLUA argues that, under Harvey, Judge Moore's display of the Ten Commandments would be constitutional only if the plaque were in the context of a historical display of other ancient sources of law.
The ACLUA further maintains that Judge Moore's display of the Ten Commandments is not sanctioned by Marsh, because, it says, there is no long-standing tradition of having them similarly displayed, and that what Judge Moore refers to as accepted acknowledgments of God, or what the ACLUA calls "ceremonial deism," are different from the practices at issue in this present case. Stated differently, it argues that the simple courtroom invocation "May God save these United States and this Honorable Court" and the term "In God We Trust" used on United States currency are different from the prayers offered in Judge Moore's courtroom. The ACLUA says that those examples have become so much a part of the American vernacular that they lack real religious meaning, but that Judge Moore's practices have a substantive religious meaning that he intends to convey.

The Alabama Freethought Association
The Alabama Freethought Association ("AFA") also argues that the practices in question in this case are unconstitutional, citing Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), for the proposition that state-sponsored prayer that promotes a religion is unconstitutional. The AFA further maintains that Judge Moore has allowed only Christian ministers of Protestant denominations to lead prayers in his courtroom and is thus violating the dictates of Larson. It also argues that Judge Moore similarly violates Larson by displaying what it calls a Protestant version of the Ten Commandments on the wall, stating that the content and meaning of the Commandments are debated by both Christian and Jewish theologians.
The AFA, like the ACLUA, also argues that the trial judge correctly applied the Lemon test, and it argues that Marsh`s authorization of prayer is not applicable in this case, because, it says, Marsh was limited to prayers offered in legislative assemblies, for which there was an unbroken history since the founding of the Republic. It argues that the decision in Marsh does not address prayers in courts, and, further, that even if it did, no party presented evidence of a continuous practice of offering prayers in courtrooms in Alabama. The AFA further contends that, in contrast to legislative bodies, courts must be impartial and must be seen as impartial. It argues that the Alabama Canons of Judicial Ethics require such impartiality and require judges to avoid the appearance of impropriety.

Arguments of the Amici Curiae
In addition to the briefs filed by the parties, this Court has also received briefs from *973 several amici curiae, which may generally be classified as either supporting the trial court's resolution of the matter or opposing it. I will, very briefly, outline the arguments presented by the amici.
Briefs were filed by the following amici in support of Judge Price's resolution of this case, and, therefore, in opposition to Judge Moore's practices: the American Jewish Congress, People for the American Way, and Americans United for Separation of Church and State; the Alabama Clergy, the Baptist Joint Committee on Public Affairs, Clifton Kirkpatrick, as stated clerk of the General Assembly of the Presbyterian Church (U.S.A.), the Interfaith Alliance, and the Union of American Hebrew Congregations; the Anti-Defamation League; and a group of university professors (collectively "the Alabama historians").
The principal argument presented by those supporting Judge Price's resolution is that Lemon has never been overruled by the Supreme Court and that it therefore remains the law. Under Lemon, they argue, Judge Moore's practices are unconstitutional. They cite Engel v. Vitale, 370 U.S. 421, 424, 82 S.Ct. 1261, 1263, 8 L.Ed.2d 601 (1962), for the proposition that the Supreme Court has previously determined that prayer is inherently religious. Citing Larson v. Valente, 456 U.S. at 244, 102 S.Ct. at 1683, some amici argue that, even if Marsh controlled, Judge Moore's actions would still be unconstitutional because, they say, he is giving preferential treatment to the Christian religion.
Other amici argue that the practice of having only Christian ministers offer prayers not only violates Lemon, but also violates the "endorsement test" proposed by Justice O'Connor in her concurring opinion in Lynch, supra, because, these amici say, nonbelievers will receive the message that they are outsiders.
Some amici argue that the separation of church and state actually works to the benefit of religion, by preventing politicians from expropriating religion to achieve a political benefit. Others argue that public officials, acting in their public roles, do not have First Amendment rights of free speech with regard to religious beliefs, and that the Establishment Clause prohibits them from engaging in the type of behavior at issue in this case.
One amicus argues that the "original intent doctrine" should not be dispositive because, it says, most who apply that doctrine take quotes out of context and reach results inconsistent with the spirit of the Constitution.
Briefs were filed by the following amici in opposition to Judge Price's resolution of this case, and, therefore, in support of Judge Moore: the American Family Association and the National Clergy Council; the Christian Family Association; the members of the Alabama delegation to the 105th Congress of the United States;[23] the American Center for Law and Justice of Alabama; and the Rutherford Institute of Alabama, Inc. Among the arguments presented by those opposing Judge Price's resolution is the argument that the Lemon test was abandoned by the Supreme Court in Rosenberger, that Lemon is dead, and that Marsh controls. Some amici argue that in its Marsh decision the Supreme Court specifically mentioned courts and that because prayer has traditionally been offered in Etowah County courts it is constitutional, either specifically under Marsh or under Marsh's analysis. Some argue that Justice O'Connor's "endorsement test," recognized by a plurality of the Supreme Court in Capitol Square Review & Advisory Board v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), is the most appropriate test to apply and that under that test the facts of this case would not constitute an establishment of religion.
Some amici argue that the trial court's injunction is unconstitutional as an improper infringement upon Judge Moore's rights under the Free Exercise Clause. Others argue that the Establishment Clause cannot be given the same meaning when applied against a State official or agency as it is given when applied to a Federal official or agency, because *974 the Establishment Clause has not been made fully applicable to the states. Some argue that courtroom prayer is distinguishable from school prayer because those persons in a courtroom, usually adults, are not as subject to intellectual coercion or peer pressure as children.
Some amici argue that the Ten Commandments display is constitutional, even under Lemon, because, they argue, it has a secular purpose, its primary effect is secular (to solemnize the proceedings), and there is no excessive entanglement in that no denomination or church is involved, no government funds are expended, and Judge Moore does not participate in formulating the prayers or in saying them. Further, some amici argue that hanging the Ten Commandments on the courtroom wall does not make any religious statement or convey any religious meaning, and, therefore, does not violate the Establishment Clause.

Consideration of the Arguments
As one can see from the arguments supporting the trial court's judgment and those opposing it, the principal issue in this case is whether the trial court correctly relied upon Lemon, and upon Constangy and Harvey, which followed Lemon, or whether the trial court should have applied Marsh and Anderson.[24]
In examining the merits of this case, I did substantial research in an attempt to understand the current state of Establishment Clause jurisprudence. I quickly realized that the "delineation of the constitutionally permissible relationship between religion and government is a most difficult and sensitive task, calling for the careful exercise of both judicial and public judgment and restraint." School Dist. of Abington Tp., Pa. v. Schempp, 374 U.S. 203, 305, 83 S.Ct. 1560, 1615, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring, joined by Harlan, J.). The dozens of cases decided by the Supreme Court since Schempp was released tend to show the truth of Justice Goldberg's concluding observation that "the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." Id. at 308, 83 S.Ct. at 1616 (emphasis added).[25]

*975 Distinguishing Between "Real Threat and Mere Shadow" in This Case

One thing is obvious in this case. The trial court applied the three-pronged test articulated in Lemon, the test the judges in Constangy and Harvey used. Consequently, the determination of the continued viability of the Lemon test would shed considerable light on the difficult issues presented in this case. A key factor in that determination is an analysis of how Rosenberger affects the Lemon test.
Legal scholars have expressed their views, and typical of some of their comments are those in the introduction to an article entitled The Supreme Court's Jurisprudence of Religious Symbol and Substance, by David L. Gregory and Charles J. Russo in 28 Loy. U. Chi. L.J. 419 (1997):
"During the closing weeks of the 1994-1995 Term, the United States Supreme Court issued Rosenberger v. Rector & Visitors of the University of Virginia and Capitol Square Review & Advisory Board v. Pinette, two decisions that further obfuscated the parameters of both free exercise and establishment of religion. In these opinions, the Court again failed to articulate clear guidelines for the many aspects of religious activity in the public arena. The decisions present the nation with the very difficult perhaps impossible task of effectively balancing potentially conflicting constitutional principles. More specifically, the cases raise the trying question of to what extent, if any, the government can regulate religious speech without violating the First Amendment Free Exercise and/or Establishment Clauses by aiding, advancing, or suppressing a particular religious perspective."[26]
*976 Professor Laura Underkuffler-Freund, in an excellent article entitled The Separation of the Religious and the Secular: A Foundational Challenge to First Amendment Theory, 36 Wm. & Mary L.Rev. 837 (1995), presents an analysis of the evolution of the First Amendment that I find very persuasive. Her central premise is that, when the First Amendment was ratified, protecting freedom of conscience was to be its primary purpose. She notes that "religious establishments by government were seen as potentially corrupting... to individuals, who would be forced to act in ways contrary to the dictates of conscience in order to obtain public power or benefits." Id. at 961. She states that the framers made sure that "the protection of conscience was imperative." Id. at 891. She writes: "Of all the `fundamental rights' heralded during the Founding Era, calls for freedom of conscience were the most insistent and the most intense."[27]
In her article, Professor Underkuffler-Freund questions the practice of attempting to draw a line of demarcation between the religious and the secular, in individual and collective life, and the attempt to use this line of demarcation as the foundational principle for First Amendment religious guarantees. She proposes, therefore, that a useful framework within which to analyze First Amendment establishment and free exercise issues is the application of what she terms a "historical approach." That approach would recognize that the operational principle in such cases is the protection of individual conscience.
It appears to me that Professor Underkuffler-Freund's approach of recognizing that the religious and the secular can never be divided into separate spheres has merit and that Rosenberger indicates that the Supreme Court, as some suggest, may be shifting its Establishment Clause jurisprudence to apply an analysis that closely parallels the analysis Professor Underkuffler-Freund suggests.
I note that the argument has been presented to this Court that the Fourteenth Amendment, which is applicable to the States, did not fully incorporate in its concept of due process the principles of the Establishment Clause, and, therefore, that the Establishment Clause does not apply to the States to the same extent as to the Federal Government, but I do not address this argument.[28]

*977 Conclusion

What is the current state of the law? It is impossible to state with assurance that the law of the land is settled. However, it seems to me that the Supreme Court's decision in Rosenberger shows that the Court is moving away from the Lemon test and may be shifting its Establishment Clause jurisprudence so that strict separationalism may be a thing of the past.[29] Given that, I believe that Justice O'Connor suggested the most effective method for considering First Amendment religious freedom cases, in Board of Educ. of Kiryas Joel Village School Dist. v. Grumet, 512 U.S. 687, 719, 114 S.Ct. 2481, 2499, 129 L.Ed.2d 546 (1994) (O'Connor, J., concurring), when she noted that "it is more useful to recognize the relevant concerns in each case on their own terms," and I would follow her suggestion in conjunction with Justice Goldberg's suggestion in Schempp, over 30 years ago, that we consider whether a practice presents a "real threat [or a] mere shadow."[30]
When I apply the "real threat [or a] mere shadow" test in this case, I cannot conclude that the practices challenged here are different from those that other courts have held constitutional. I reach this conclusion in part because I am persuaded that the facts of this case are analogous to those in Marsh.[31] Therefore, I believe that hanging a small plaque of the Ten Commandments on a courtroom wall, and having a member of the local clergy say a prayer when the jury assembles, is not State action that would tend to establish a religion within the meaning and purpose of the First Amendment.
Although the Supreme Court has not ruled on a case involving facts such as those presented here, I believe that Marsh provides a more suitable model for deciding this case than Lemon. It is, of course, always difficult to predict what the Supreme Court will do, but, based upon my research and study, I would ask a simple question: In view of the relevant concerns that led the framers of the First Amendment to prohibit the establishment of a religion, does the display of a small plaque of the Ten Commandments and the use of clergy-led invocations constitute a "real threat" of an establishment of religion or a "mere shadow" of such a threat?
My judgment would be that Judge Moore's practices present no "real threat," but at most, a "mere shadow."
HOUSTON, Justice (concurring in the result).
Established caselaw holds that there must be a bona fide existing controversy of a *978 justiciable character to confer upon a court subject-matter jurisdiction to grant relief under the Declaratory Judgment Act, Ala.Code 1975, § 6-6-220 et seq. See the cases collected at 20 Ala. Digest 2d, Declaratory Judgment Key Nos. 61, 62, 64, 65, 66, 67, 68 (1994). I agree that such a controversy is not present here and that this Court is duty-bound to notice ex mero motu the absence of subject-matter jurisdiction. Stamps v. Jefferson County Board of Education, 642 So.2d 941 (Ala.1994). I agree that the trial court did not have subject-matter jurisdiction and, therefore, that it lacked the authority to enjoin Judge Moore from displaying the Ten Commandments in his courtroom or to prevent him from initiating a prayer before jury selection. I do not agree that this Court has the authority, in the absence of a violation of the United States Constitution or the Alabama Constitution, presented to this Court for review in proper form, to tell a trial judge how to furnish his or her courtroom or chambers or that this Court has the authority to tell a trial judge how to conduct proceedings in the courtroom that are not of record. I do not agree with all of the language of the majority opinion or with the implied characterization of the parties' actions or motivations in litigating the important constitutional issue that they have attempted to resolve in this case. Therefore, I concur in the result.

On Application for Rehearing
COOK, Justice.
APPLICATION OVERRULED.
ALMON and SHORES, JJ., concur.
HOUSTON, J., concurs specially.
MADDOX, J., dissents.
HOOPER, C.J., and KENNEDY, and SEE, JJ., recuse themselves.
HOUSTON, Justice (concurring specially).
On original submission, I concluded that a justiciable controversy was not present here and that this Court was duty-bound to notice ex mero motu the absence of subject-matter jurisdiction. The State's application for rehearing has not changed my view in that respect.
The State concedes that there was no adverseness between it and Judge Moore; the State takes the position, instead, that Judge Moore should be realigned as a plaintiff and that the trial court had subject matter jurisdiction. In this connection, the State also concedes that the counterclaims the ACLU, the AFA, and the individual defendants filed against the State and Chief Justice Hooper were not viable and, thus, could not form the underpinnings for a justiciable controversy. The State argues, however, that a justiciable controversy existed because the ACLU, the AFA, and the individuals remained in the case as defendants. Thus, according to the State, "there were adverse parties throughout the case." This argument is not persuasive, in light of our caselaw. In State ex rel. Baxley v. Johnson, 293 Ala. 69, 74-75, 300 So.2d 106, 111 (1974), this Court acknowledged that "the Attorney General has the right and power to file suits for declaratory judgment," but, nonetheless, pointed out that "the parties must be damaged and seeking a remedy, not just advice." As was pointed out in the majority opinion, the State did not allege that it had been damaged by anything the ACLU, the AFA, or the individual defendants had done and the State sought no relief with respect to these defendants. It is also worth pointing out that the ACLU, the AFA, and the individual defendants did not file a cross-claim against Judge Moore. Whether the AFA and the individual defendants could have done so, given the federal district court's ruling in Alabama Freethought Ass'n v. Moore, 893 F.Supp. 1522 (N.D.Ala.1995), I need not address. I note only that the federal action was dismissed for lack of standing under the case-or-controversy requirement of Article III of the United States Constitution. Although that action was decided under federal law and was dismissed without prejudice, the respective interests of the AFA and the individual defendants in litigating that lawsuit were fully explored, and no appeal was taken from the district court's ruling.
SEE, Justice (recusing).
Because I served as counsel for Judge Moore in the federal court case regarding this matter, I must recuse.
NOTES
[*] Jeff Sessions is no longer attorney general. See Rule 43(b), Ala. R. App. P., providing that when a public officer is a party to an appellate proceeding and ceases to hold office, "the public officer's successor is automatically substituted as a party."
[1] The record does not reveal a cross-claim against Judge Moore, either in his individual capacity or in his official capacity.
[2] None of the parties question the justiciability of this controversy. However, justiciability is jurisdictional, that is, "[t]here must be a bona fide existing controversy of a justiciable character to confer upon the court jurisdiction to grant declaratory relief." State ex rel. Baxley v. Johnson, 293 Ala. 69, 73, 300 So.2d 106, 110 (1974). Unless the trial court has before it a justiciable controversy, it lacks subject matter jurisdiction and any judgment entered by it is void ab initio. Stamps v. Jefferson County Bd. of Educ., 642 So.2d 941, 945 (Ala. 1994); Luken v. BancBoston Mortg. Corp., 580 So.2d 578 (Ala.1991); Wallace v. Burleson, 361 So.2d 554, 555-56 (Ala.1978). "This Court is duty bound to notice ex mero motu the absence of subject-matter jurisdiction." Stamps, supra, 642 So.2d at 945 n. 2.
[3] The exception, of course, was the allegation in ¶ 20, which we shall discuss again in Part II.
[4] Stamps involved an action "brought by special education teachers against their employers seeking a judgment construing [the Nursing Practices Act, Ala.Code 1975, §§ 34-21-1 to -63,] and declaring that their duties subject[ed] them to prosecution by the board of nursing for the unlicensed practice of nursing." 642 So.2d at 944. This Court held that the action was nonjusticiable because of the failure of the employees to join as a defendant the board of nursing. Id. at 944-45.
[5] Because the "conduct of a circuit judge" cannot be regulated by the Chief Justice, "standing alone," a fortiori it cannot be regulated by the Governor and the attorney general. This is so, because, like the Governor, the attorney general is an officer of the executive branch of government. McDowell v. State, 243 Ala. 87, 89, 8 So.2d 569, 570 (1942). In our tripartite system of government, executive branch officials have no colorable authority to control a circuit judge's courtroom demeanor.
[6] [Statement of Justice Butts:] Attorney/firm in this case also involved in sale/merger/litigation transaction with company in which spouse is director/stockholder.
[7] [Statement of Justice See:] Because I served as counsel for Judge Moore in the federal court case regarding this matter, I must recuse.
[8] The First Amendment to the Constitution of the United States provides in pertinent part:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...."
[9] The dismissal of the action is without prejudice; therefore, it could be prosecuted again.
[10] The Court did not grant oral argument, although requests for oral argument were filed. Each of the several parties filed briefs, and several persons, organizations, and associations filed briefs as amici curiae, some supporting the judgment of the trial court and some opposing that judgment. None of these briefs suggests that this case does not present a justiciable controversy.
[11] The "wall of separation" doctrine, which was allegedly derived from a letter Thomas Jefferson wrote to the Danbury Baptist Association, was first discussed in Reynolds v. United States, 98 U.S. 145, 164, 25 L.Ed. 244 (1878). As noted in 1992 by Justice Blackmun, "The Court in Reynolds accepted Thomas Jefferson's letter to the Danbury Baptist Association `almost as an authoritative declaration of the scope and effect' of the First Amendment." Lee v. Weisman, 505 U.S. 577, 599, n. 1, 112 S.Ct. 2649, 2661-62, n. 1, 120 L.Ed.2d 467 (Blackmun, J., concurring) (quoting Reynolds, 98 U.S. at 164); see also Everson v. Board of Educ. of Ewing Tp., 330 U.S. 1, 16, 67 S.Ct. 504, 511-12, 91 L.Ed. 711 (1947) (quoting Reynolds, 98 U.S. at 164).

Jefferson's letter stated:
"Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legislative powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should `make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between Church and State. Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore to man all his natural rights, convinced he has no natural right in opposition to his social duties."
Letter from Thomas Jefferson to Nehemiah Dodge, Ephraim Robbins, and Stephen S. Nelson, a Committee of the Danbury, Connecticut, Baptist Association (Jan. 1, 1802), in 16 The Writings of Thomas Jefferson, Containing his Autobiography, Notes on Virginia, Parliamentary Manual, Official Papers, Messages and Address, and Other Writings, Official and Private, Now Collected and Published in their Entirety for the First Time 281, 281-82 (Albert E. Bergh ed., 1907).
[12] In Morgan, this Court stated:

"It is insisted by appellant that appellee was not entitled to a declaratory judgment, for the reason that the petition or bill of complaint only sought an advisory opinion as to whether certain legislation repealed or otherwise affected prior legislation and no specific or express relief was sought with reference to any transaction or dispute set forth in the petition or bill of complaint. Our cases point out, however, that the declaratory judgment statute will be extended to cases involving public rights or important public matters and to controversies in which the legality of action of public officials or public agencies is challenged. We have said in effect that where official action done or threatened is challenged as unlawful, whether the lack of authority appears in the provisions of a statute or because of its unconstitutionality, the controversy can be determined under the declaratory judgment statute rather than force the parties to seek injunctive relief. Donoghue v. Bunkley, Comm'r of Licenses, Ala.Sup., [247 Ala. 423,] 25 So.2d 61 [(1946)]; State v. Inman, 238 Ala. 555, 191 So. 224 [(1939)]; State v. Tuscaloosa County, 233 Ala. 611, 172 So. 892 [(1937)]; Lang v. City of Mobile, 239 Ala. 331, 195 So. 248 [(1940)]; Scott v. Alabama [State] Bridge Corp., 233 Ala. 12, 169 So. 273. [(1936)]."
248 Ala. at 25, 26 So.2d at 110 (footnote omitted).
[13] I do not address the question whether a majority of this Court would have authority to direct a circuit judge to follow certain guidelines in his management of sessions of court or in decorating the courtroom in which he presides. In my judgment, that question has not been presented to this Court, and any opinion on that question would at best be advisory only, and the law permits this Court to issue advisory opinions only in limited circumstances, which are not present in this case.
[14] In Ex parte Blue Cross & Blue Shield of Alabama, 582 So.2d 469, 472 (Ala.1991), the Court, in n. 1, stated:

"Pursuant to this Court's opinion in Ex parte Weaver, 570 So.2d 675 (Ala. 1990), the Commissioner's appeal was dismissed by the Attorney General. The Commissioner was realigned as a party plaintiff."
[15] The Alabama Constitution of 1901, Art. V, § 113, provides:

"The supreme executive power of this state shall be vested in a chief magistrate, who shall be styled `The Governor of the State of Alabama.'"
The Alabama Constitution of 1901, Art. V, § 120, further provides:
"The Governor shall take care that the laws be faithfully executed."
[16] Although three Justices dissented, a majority of this Court in Ex parte Weaver, 570 So.2d 675, 684 (Ala. 1990), held that "the attorney general has the power to manage and control all litigation on behalf of the State of Alabama."
[17] As pointed out in a dissenting opinion in Ex parte Weaver:

"From time to time, Governors have intervened in cases in which they thought the public interest was involved and was not being adequately protected. See Continental Telephone Co. of the South v. Alabama Public Service Commission, 479 So.2d 1195 (Ala.1985); General Telephone Co. of the Southeast v. Alabama Public Service Commission, 356 So.2d 612 (Ala. 1978); Alabama Public Service Commission v. South Central Bell Telephone Co., 348 So.2d 443 (Ala.1977); Alabama Gas Corp. v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975); State v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975)."
570 So.2d at 688 (Houston, J., dissenting).
[18] In Lemon, the Supreme Court adopted a three-pronged test for determining whether a challenged activity is permitted under the Establishment Clause. To be permitted, (1) the challenged activity must have a secular purpose; (2) the activity's main effect must neither advance nor inhibit religion; and (3) the challenged activity must not excessively entangle the state with religion. Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111.
[19] See, Michael Stokes Paulsen, Lemon is Dead, 43 Case W. Res. L. Rev. 795, 829 (1993), writing about the probable fate of Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). Paulsen had wagered with a fellow law professor that the Court would repudiate Lemon. Even though the Court, in Lee v. Weisman, declared the prayer involved in that case to be unconstitutional, Paulsen stated:

"Lemon is dead. My proposition in this article is that the Court has indeed interred the Lemon test and replaced it with a coercion test, albeit one of uncertain parameters and an uncertain future. I do not mourn Lemon`s passing. There was much that was dreadfully wrong with Lemon during its approximately twenty-year life and we are better off without it. I come not to praise Lemon, but to bury it."
[20] For representative commentary on Rosenberger, see Larry Cata Backer, The Incarnate Word, That Old Rugged Cross and the State: On the Supreme Court's October 1994 Term Establishment Clause Cases and the Persistence of Comic Absurdity as Jurisprudence, 31 Tulsa L.J. 447 (1996); Howard Wade Bycroft, ReadyAim Fire!-The Supreme Court Continues its Assault on the Wall of Separation in Rosenberger, 31 Tulsa L.J. 533 (1996); Jennifer Lynn Davis, Serpentine Wall of Separation Between Church and State: Rosenberger v. Rector and Visitors of the University of Virginia, 74 N.C. L. Rev. 1225 (1996); Paul L. Hicks, The Wall Crumbles: A Look at the Establishment Clause Rosenberger v. Rector and Visitors of the University of Virginia, 98 W. Va. L. Rev. 363 (1995); Rena M. Bila, Note, The Establishment Clause: A Constitutional Permission Slip for Religion in Public Education, 60 Brook. L. Rev. 1535 (1995); Charles Roth, Note, Rosenberger v. Rector: The First Amendment Dog Chases its Tail, 21 J.C. & U.L. 723 (1995); Robert L. Waring, Note, Talk is Not Cheap: Funded Student Speech at Public Universities on Trial, 29 U.S.F. L. Rev. 541 (1995).
[21] The State points out that Marsh was applied in the Alabama case of Huff v. State, 596 So.2d 16 (Ala.Crim.App.1991), cert. quashed, 596 So.2d 16 (Ala. 1992). In Huff, the defendant argued that the trial court erred in denying his motion to strike the venire because, he argued, the term of court in which he was tried was opened with a prayer; the defendant Huff argued that opening the term with a prayer violated the "establishment of religion" clause of the First Amendment to the United States Constitution and the "establishment of religion clause" contained in Article 1, Section 3 of the Constitution of Alabama of 1901. The Court of Criminal Appeals stated that on appeal Huff had cited "no law or authority in his argument" for striking the venire, but that court noted that at trial Huff had made the following motion: "[B]ased on recent rulings from the federal courts ... prayer in a public setting constitutes a violation of separation of church and state clauses of the United States Constitution and, therefore, to have that prayer at the beginning of this session was invalid and is improperlyit has improperly tainted the proceedings [and,] on that basis, we would move that this venire is due to be dismissed." 596 So.2d at 22.

The Court of Criminal Appeals, after citing caselaw, held that the defendant had failed to proved sufficient prejudice and stated:
"Moreover, we find no error in opening the court session with a prayer. See, e.g., Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (upholding the practice of opening sessions of Congress with prayer.)"
596 So.2d at 22.
[22] The ACLU argues that to be constitutional under Lemon, the practices in question must meet all three Lemon prongs: (1) that they have a secular purpose; (2) that their main effect neither advances nor inhibits religion; and (3) that they do not excessively entangle the state with religion. Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111.
[23] Although an amicus brief was submitted in the name of the Alabama Congressional delegation, the brief does not specify whether every member of the delegation participated in its submission or agrees with the arguments presented.
[24] I note that in Summum v. Callaghan, 130 F.3d 906, 910, n. 2, (10th Cir. 1997), a case dealing with the placement on the county courthouse lawn of a monolith, upon which certain religious tenets were to be inscribed, the Court of Appeals for the Tenth Circuit stated, "Since Anderson was decided, however, more recent cases, including a Supreme Court case, cast doubt on the validity of our conclusion that the Ten Commandments monolith is primarily secular in nature." (Citation omitted.) Specifically, the court stated that Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), which held that a statute requiring the posting of the Ten Commandments in public school classrooms violated the Establishment Clause, may have called Anderson into question. Summum, 130 F.3d at 912 n. 8. However, the Tenth Circuit in Summum did not state how it would have decided Anderson, under Stone v. Graham, and it specifically declined to address any Establishment Clause claims presented in Summum. Id. at n.8.

Although I cannot predict how the Tenth Circuit would rule on this issue, I believe that a distinction may be drawn between cases involving public school settings and non-public-school settings; therefore, I do not believe that Stone necessarily undercuts the result reached in Anderson. I also note that Stone, a five-to-four per curiam opinion, applied the Lemon test, which, as I explain later in this opinion, has been substantially undermined by recent First Amendment jurisprudence, and that at least one Justice believed that certain aspects of the Court's opinion in Stone were "without precedent in Establishment Clause jurisprudence." Stone, 449 U.S. at 43, 101 S.Ct. at 194-95 (Rehnquist, J., dissenting).
[25] One legal writer, commenting on the decisions of the Supreme Court during the past three decades, stated that "if the sheer number of critics is to be weighed in the balance, the United States Supreme Court's decisions have departed from all consistency," and that "[a]lmost no one, not even a majority of the Justices on the Court, is pleased with the current state of First Amendment case law concerning religion." Carl H. Esbeck, A Restatement of the Supreme Court's Law of Religious Freedom: Coherence, Conflict, or Chaos?, 70 Notre Dame L. Rev. 581, 583 (1995). Esbeck concludes that First Amendment religious-freedom jurisprudence is unlike most of the jurisprudence arising from threats to fundamental rights protected by the United States Constitution; most of that jurisprudence arises from "bipolar conflicts (an individual versus a law or acts by an official under color of law) [that] are resolved by straightforward balancing tests." Id. He says that "First Amendment religious freedom is not nearly so two-dimensional," and that "the juridical task of laying down principled rules regarding religious freedom and the First Amendment is more multidimensional than other areas of rights analysis." Id. at 586. (Footnote cont'd)

Another legal writer, Laura Underkuffler-Freund, an associate professor of law at Duke University School of Law, writing in an introduction to a project, a major portion of which was submitted in partial fulfillment of the requirements of a J.S.D. degree, stated:
"The First Amendment to the Constitution of the United States guarantees the free exercise of religion and prohibits the establishment of religion by government. In dozens of cases decided in the past three decades, the Supreme Court, as the institution designated under the federal system to ultimately resolve these issues, has struggled to identify coherent principles of interpretation. The difficulties inherent in attempting to reconcile the prerogatives of individual belief with the majoritarian acts of governmental bodies have created a jurisprudence of complex, conflicting, and often undulating principles."
Underkuffler-Freund, The Separation of the Religious and the Secular: A Foundational Challenge to First Amendment Theory, 36 Wm. & Mary L. Rev. 837, 838 (1995).
[26] In footnotes 1 and 2 to that introduction, the writers listed several other commentaries on the effects of Rosenberger and Capitol Square:

"1.... For representative commentary on Rosenberger, see Larry Cata Backer, The Incarnate Word, That Old Rugged Cross and the State: On the Supreme Court's October 1994 Term Establishment Clause Cases and the Persistence of Comic Absurdity as Jurisprudence, 31 Tulsa L.J. 447 (1996); Howard Wade Bycroft, ReadyAimFire?-The Supreme Court Continues Its Assault on the Wall of Separation in Rosenberger, 31 Tulsa L.J. 533 (1996) [`The Rosenberger decision represents another step in the Court's recent move towards abolishing the wall of separation between church and state']; Jennifer Lynn Davis, The Serpentine Wall of Separation Between Church and State: Rosenberger v. Rector and Visitors of the University of Virginia, 74 N.C. L. Rev. 1225, 1252 (1996) [`One significant aspect of the Rosenberger decision is that the Court decidedly chose not to invoke the Lemon test in reaching its decision.... However, the fact that the Court merely chose not to use Lemon, rather than explicitly overruling it, may not be the victory that Lemon `s opponents desire.']; Paul L. Hicks, The Wall Crumbles: A Look at the Establishment Clause: Rosenberger v. Rector and Visitors of the University of Virginia, 98 W. Va. L. Rev. 363, 394 (1995) [`The Accomodationist majority in Rosenberger has continued the trend of the Supreme Court in putting an end to the belief that to conform to the Establishment Clause of the First Amendment the government must exclude religion.... Therefore, it appears likely that the "wall of separation" has been razed and that it will be easier in the future for religious groups to participate in aide programs that the government administers in a religion-neutral manner ....']; Rena M. Bila, Note, The Establishment Clause: A Constitutional Permission Slip for Religion in Public Education, 60 Brook. L. Rev. 1535 (1995); Charles Roth, Note, Rosenberger v. Rector: The First Amendment Dog Chases its Tail, 21 J.C. & U.L. 723 (1995); Robert L. Waring, Note, Talk is Not Cheap: Funded Student Speech at Public Universities on Trial, 29 U.S.F. L. Rev. 541 (1995).
"2.... For representative commentary on Capitol Square III, see Backer, supra note 1; Brant W. Biship, Protecting Private Religious Speech in the Public Forum: Capitol Square Review and Advisory Board v. Pinette, [515 U.S. 753,] 115 S.Ct. 2440 [132 L.Ed.2d 650] (1995), 19 Harv. J.L. & Pub. Pol'y 602 (1996); Bernard James & Joanne Kuhns, Establishment Clause Yields to Free Speech, Nat'l L.J., July 31, 1995, at C10; John E. Joiner, Note, A Page of History or a Volume of Logic?: Reassessing the Supreme Court's Establishment Clause Jurisprudence, 73 Denv. U.L. Rev. 507 (1996); Gregory A. Napolitano, Note, Constitutional LawFirst AmendmentEstablishment ClauseSymbolic Expression, 34 Duq. L. Rev. 1209 (1996); Leading Cases, Viewpoint DiscriminationFunding for Religious Publication, 109 Harv. L. Rev. 210 (1995)."
[27] For recent Establishment Clause and Free Exercise Clause analyses, see, in addition to Professor Laura Underkuffler-Freund's article, Paul Earl Pongrace III, Justice Kennedy and the Establishment Clause: The Supreme Court Tries the Coercion Test, 6 U. Fla. J.L. & Pub. Pol'y 217 (1994); Jay Alan Sekulow et al., Religious Freedom and the First Self-Evident Truth: Equality as a Guiding Principle in Interpreting the Religion Clauses, 4 Wm. & Mary Bill Rts. J. 351 (1995); Karen T. White, The Court-Created Conflict of the First Amendment: Marginalizing Religion and Undermining the Law, 6 U. Fla. J.L. & Pub. Pol'y 181 (1994); Marc Falconetti, Comment, Constitutional Law: Does the Establishment Clause Prohibit Sending Public Employees into Religious Schools? 6 U. Fla. J.L. & Pub. Pol'y 277 (1994). See also Kristin M. Engstrom, Establishment Clause Jurisprudence: The Souring of Lemon and the Search for a New Test, 27 Pac. L.J. 121 (1995); Jason C. Kravitz, Repelling a Constitutional Battering Ram: The Fight to Keep Nonstudent Religious Worship Services Out of Public Schools, 19 Vt. L. Rev. 643 (1995).
[28] A similar argument was rejected by the Supreme Court in Wallace v. Jaffree, 472 U.S. 38, 48, 105 S.Ct. 2479, 2485, 86 L.Ed.2d 29 (1985). Therefore, the law on this issue appears settled. However, I note that a respected scholar has questioned the extent to which the Fourteenth Amendment was intended to incorporate the Bill of Rights fully against the several States. See, e.g., Raoul Berger, Government by Judiciary: The Transformation of the Fourteenth Amendment (Harvard U. Press 1977); Raoul Berger, The Fourteenth Amendment and the Bill of Rights (1989).

I further note that most of the decided cases have involved allegedly unconstitutional action committed by State and local officials. See, e.g., Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29, County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), Lynch, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604, Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844. In contrast, it appears that discussions of various practices engaged in by the Federal Government, including Congress's practice of employing chaplains, the practice of minting coins inscribed with the words "In God we Trust," and the Federal judiciary's use of the call "God save these United States," have been limited to dicta in several opinions, dissents, and special writings in cases involving State and local officials. See, e.g., Lynch, supra. I find no United States Supreme Court case in which these Federal practices have been directly challenged, even though the First Amendment is a limitation on Congressional power.
[29] Casey M. Nault, Bridging the Separation of Church and State: How Rosenberger Threatens Religious Liberty, 70 S. Cal. L. Rev. 1049 (1997). Nault writes, at 1049-50, "The Court's decision in Rosenberger reflects the extent to which the Court has begun to shift its Establishment Clause jurisprudence back to where it was before its landmark decision in Everson v. Board of Education [330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947)]."

Although I do not totally agree with Nault's assessment of the ultimate effect of the Rosenberger decision, I do feel that Rosenberger captures what Jefferson really intended when he penned the "wall of separation" metaphor to the Danbury Baptist Association. Clearly, Rosenberger indicates that a State cannot discriminate against religious speech in a public forum and seems to move further away from the Lemon test.
[30] Justice Goldberg also wrote in Schempp that "untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious." 374 U.S. at 306, 83 S.Ct. at 1615. I cannot be certain of Justice Goldberg's intent; however, his statement warrants consideration.
[31] I would also note that this case does not present the public-school context. Cf. Marsh, 463 U.S. at 792, 103 S.Ct. at 3336 (distinguishing between adults, presumably not susceptible to "religious indoctrination" and children subject to "peer pressure").